Filed 1/29/21  P. v. Delp CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E071300 |
| v. | (Super.Ct.No. RIF1605679) |
| JIMMIE LEE DELP, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County. Mac R. Fisher, Judge. Affirmed in part; reversed in part with directions.

Jason L. Jones, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal, Randall D. Einhorn and Susan Elizabeth Miller, Deputy Attorneys General, for Plaintiff and Respondent.

1

A jury convicted Jimmie Lee Delp of three counts of committing lewd and lascivious acts on a child under 14 years of age (Pen. Code, § 288, subd. (a), unlabeled statutory citations refer to this code) against more than one victim. (§ 667.61, subd. (e)(4).) The trial court sentenced Delp to two consecutive and one concurrent 15-year-to-life sentences under the "One Strike Act." (§ 667.61, subd. (e).)

Delp committed these acts more than 10 years before his trial, during a period when he was going through a divorce and living with a close friend. The victims were the friend's two young daughters who were between five and seven and seven and nine when Delp took advantage of their proximity to repeatedly molest them. The victims came forward after their father mentioned Delp's name years later, when the girls were teenagers. They accused Delp of molesting them repeatedly over a period of months and were able to describe three occasions of the abuse with sufficient detail to support convictions.

Delp identifies problems with his conviction, his sentence, and the assessments, fees, and a restitution fine the trial court imposed on him.

First, he argues the trial court erred by allowing expert medical testimony about the Child Sexual Assault Accommodation Syndrome for purposes of rebutting defense counsel's attempts to raise questions about the credibility of the victims' accusations. He argues for a change in California law to exclude such testimony on the ground it is not widely accepted in the scientific community. We conclude the law in California is clear that standard doesn't apply to expert psychological testimony and the court properly

2

admitted it for the limited purpose of bolstering the victims' credibility. We therefore affirm the conviction.

Second, he argues his sentence is disproportionate to his crimes under section 17 of the California Constitution, which protects against cruel and unusual punishment. The trial court imposed two consecutive terms of 15 years to life and one concurrent term of 15 years to life because the offenses fall under the One Strike law as sex offenses committed against more than one young child. Delp argues the sentence is cruel and unusual because the statute lumps his crimes with a group of far more serious violent sex crimes, while other statutes punish other serious sex crimes more leniently. We conclude it was within the Legislature's broad authority to punish sex crimes against multiple young children as seriously as violent sex crimes against older children and adults. We therefore affirm the sentence.

Third, he objects to the trial court's imposition of a $1,000 restitution fine and $210 in criminal conviction and court operations assessments without first finding he had the ability to pay them. He argues *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*) established a broad due process and equal protection right to have the court determine his ability to pay before imposing various assessments, fees, and fines and required the court to stay the restitution fine until determining he has the ability to pay.

Fourth, he makes the related objection that the trial court wrongly imposed $514.58 in booking fees, treating them as mandatory, though the statute gives the court discretion not to impose those fees on defendants who don't have the ability to pay them.

We conclude the trial court properly considered Delp's ability to pay in setting the restitution fine. The probation report recommended the court impose a $10,000 restitution fine. Delp opposed the fine on the ground his life sentence and poor health would preclude him from paying it. The trial court considered Delp's objection that he wouldn't be able to pay and reduced the restitution fine from $10,000 to $1,000. Because the trial court concluded Delp could pay a $1,000 restitution fine, there's no basis for objecting that the trial court violated the principles enunciated in *Dueñas* by failing to consider his ability to pay, so we affirm the order imposing a $1,000 restitution fine.

The People concede imposing assessments on indigent defendants implicates due process and also concede the court erred under the booking fee statute by imposing fees without considering Delp's ability to pay them. They ask us to affirm on the ground that Delp forfeited the objections and because imposing the assessments (though not the fees) was harmless error. We disagree. Though there are indications that Delp may be able to pay these assessments and fees, we conclude remand is appropriate because Delp's age and poor health raise a significant doubt about his ability to earn prison wages and the record is undeveloped concerning whether he has assets from before his arrest. Also relevant is the fact that the trial court decreased or struck other recommended fines and fees on the basis that Delp couldn't afford to pay them. Because the People have not established the error was harmless, we reverse the court's order imposing the booking fees and assessments and remand for the trial court to hold a hearing on Delp's ability to pay them.

# I

## FACTS

In 2004, George H. invited his friend, Jimmie Delp, to move in with his family in their five-bedroom home in Corona. Delp, then 57 years old, was going through an acrimonious divorce at the time, and couldn't stay with his then-wife. George said he and Delp had been close friends for 20 years, and Delp had been the best man in his wedding. The two worked together at a car dealership.

George and his wife had three daughters living with them in those years. The two young daughters were born in late 1997 and late 1999, so when Delp lived with them, the older one was between seven and nine and the younger was between five and seven. Their third daughter was a teenager. George's elderly father also lived with the family. To preserve their anonymity, we refer to the two young girls as the older daughter and the younger daughter.

Delp stayed with the family until around August 2006. After moving out, he stopped having social contact with George. George said he thought the change in conduct was odd, but he chalked it up to Delp being an unusual person. He did say he was hurt when Delp didn't call to offer condolences after George was laid off from the car dealership in 2008 or after George's father died in 2015.

This prosecution came about after the older daughter, when she was 17 years old, told her father Delp had touched her sexually on numerous occasions while he lived with

them. The younger daughter reported she remembered an incident when Delp had touched her sexually as well.

A. *The Sexual Abuse*

At trial, both daughters, then 18 and 20 years old, testified against Delp.

The older daughter said Delp started doing "inappropriate things" to her when she was around seven years old. She said she thought Delp had touched her inappropriately at least 20 times. She also said he had touched her younger sister "pretty much" every time he touched her. She said she talked about the touching once or twice with her sister, but she never reported it to anyone else until she told her father when she was 17.

The older sister recalled two incidents well enough to describe the specific circumstances. She said on one occasion, she and Delp were sitting on the living room couch together late at night. She was wearing pajamas and Delp put his hand inside her pajamas and underwear and touched her vagina. She said she was scared and didn't understand what was going on, so she pretended to be asleep. She said her father and younger sister were both in the living room, but were asleep. On a second occasion, the older sister said she was sleeping in the living room at night and awoke when she felt Delp unbutton her pants. She said she tried to push his hand away, but he shushed her, put his hand down her pants, and touched her vagina.

The older daughter said she didn't tell her dad about the touching at the time because she was afraid of what he would do to Delp. She thought her father might end up going to jail for hurting him. She also said she didn't feel like she could tell anyone

6

because she didn't really understand what was going on. The touching stopped when Delp moved out. She still didn't tell her parents about the touching then because she wasn't comfortable telling them and she was still afraid of what her dad would do if he found out. She also said she was embarrassed to tell anyone what Delp had done to her.

The younger sister testified about one specific incident of molestation. She said she recalled a time when she was around five or six years old and had fallen asleep on the couch in the living room. Her father and sister were also sleeping in the living room. She felt someone unbuttoning her pants and she woke up to discover it was Delp. She resisted by buttoning her pants back up and moving to the floor to get away from him. But Delp followed her to the floor and unbuttoned her pants again. He then put his hand underneath her underwear and touched her vagina. At that point, she got up and laid down next to her father. She was scared and didn't know what to do. But Delp didn't touch her again that night. She said that was the only time she remembered Delp touching her. She said she never said anything about Delp touching her because she was scared.

Appellant moved out in August 2006.

B. *The Daughters Report the Sexual Abuse*

In 2015, when the older daughter was 17 and in high school, she told her father about Delp touching her. She said she told her dad about the abuse then because he kept bringing Delp up, and she didn't feel comfortable keeping the abuse a secret any longer. She also said she felt mature enough to understand the situation. George said she cried when she told him about the abuse and said crying was out of character for her.

George immediately asked his younger daughter if anything had happened with Delp, and she told him he had touched her inappropriately when she was five or six. She said she told her father about the abuse because she thought it would "take a weight off [her] shoulders."

George didn't contact the police right away because the allegations were so serious, and he wanted to see first whether they would report the same thing to their mom and an uncle with whom they were very close. A few weeks later, the two girls told their mother the same thing they'd told their father.

At a family vacation a few months later, both girls related the same allegations to their favorite uncle. The older daughter told him Delp had sexually assaulted her on the couch in the living room in her house in Corona. She was upset and crying when she told him. The younger daughter also told her uncle that Delp had sexually assaulted her in the house in Corona. The uncle said she was hysterical during the telling.

A few days later, George reported the incidents to the police. Deputy Sheriff Investigator David Schell was assigned to investigate the abuse. He spoke with the two victims, but didn't have them submit to a physical examination because too much time had passed for there to be physical evidence of the abuse. He said both were cooperative during the interview.

C. *Cross-Examination of the Victims*

Since the case against Delp was limited to the testimony of the victims, the defense focused on testing their credibility.

Defense counsel questioned both daughters about the circumstances surrounding the abuse. The older daughter said she and her sister tended to fall asleep on the couch in front of the television in their living room. She said this happened just about every night; they would sleep on the couch rather than in the room they shared together. She said she was afraid to sleep in her room because it was right across the hall from where Delp stayed. According to the older daughter, her father and Delp would hang out together outside, smoking cigars and talking, and then would return to the living room sometime after the girls were asleep. The younger daughter reiterated this testimony, though she said they did sometimes sleep in their own room.

Defense counsel questioned the older daughter extensively about why she had waited nearly 10 years to report the abuse. He asked her to confirm how many times she remembered the abuse happening, then asked, "And so 20 times this happened and you never once said, Hey, Dad, Jim—Jimmie's touching me?" She responded, "No." He questioned her stated reason for not telling. "[Y]ou still didn't wake up your dad because you thought he'd go to jail." She responded, "Yes." He emphasized in his questions that even after Delp had moved out she didn't tell her teenage sister, though they had a close relationship. He asked why she didn't get up and run to her grandfather's room, which was near the living room. And he questioned why she hadn't told her mother or her favorite uncle. Defense counsel also pointed out, through questioning, that both daughters had many opportunities to share the incident with friends and, in the case of the older daughter, a boyfriend.

Defense counsel asked the younger daughter why she hadn't woken her father up on the occasion of the abuse she remembered. All she could say was "I was scared and I didn't know what to do."

D. *Expert Testimony on Child Sexual Abuse Accommodation Syndrome*

Before trial, the People filed a trial brief asking permission to admit expert testimony from Dr. Jody Ward, a clinical and forensic psychologist, for the purpose of dispelling misconceptions jurors may have about children's reactions to molestation for the purpose of restoring the victims' credibility.

The People argued the expert testimony was relevant because jurors usually have no prior experience with child molestation or how children respond to molestation. The People represented the expert would not offer an opinion whether these victims had been abused. They argued this kind of expert medical testimony is not subject to the test requiring acceptance in the scientific community that applies to scientific methods of proof under *People v. Kelly* (1976) 17 Cal.3d 24 and *Frye v. United States* (D.C. Cir. 1923) 293 F. 1013.

Defense counsel countered that evidence of Child Sexual Assault Accommodation Syndrome (CSAAS) "is not admissible to prove that the complaining witness has in fact been sexually abused," but conceded such evidence "is admissible to rehabilitate the credibility of the complaining witness when the defense suggests that the complaining witness's conduct, such as delay in reporting the abuse, is inconsistent with the

complaining witness's testimony claiming that sexual abuse had occurred." (Citing *People v. McAlpin* (1991) 53 Cal.3d 1289, 1300.)

After a pretrial hearing, the trial court granted the prosecutor's motion, allowing the expert to offer general expert testimony about victims as a class to dispel misconceptions about child molestation and molesters.

At trial, Dr. Ward testified she is familiar with the concept of delayed disclosure of sexual abuse in children. She explained about two-thirds of sexually abused children delay reporting abuse until they're adults, and said even the one-third who do report the abuse as children may delay reporting for many months or years. She explained children who are molested by strangers tend to report the abuse right away, whereas children who are sexually abused by people they know tend to keep the secret for longer.

Children don't want to report the abuse because they "don't want to upset the applecart of their lives." They don't want their parents to get upset about the abuse or are afraid of either being blamed or not believed by their parents. Children who have been sexually abused also feel embarrassment and shame and they blame themselves for the abuse. She also said sexual abuse can be confusing to a child because the child knows the touching is in some sense bad or wrong and that boundaries are being broken, but the touching can also feel pleasurable.

Dr. Ward testified that many things may trigger disclosure of the abuse. She said the trigger may be experiencing their own normal sexual relationship, any kind of trouble

11

in their lives, or even hearing the abuser's name. She also said the child could be triggered to disclose the abuse if a parent asks them about it.

Dr. Ward explained that while sexual abuse usually occurs in secret, it is also very common for it to occur in a house where other people are around and even under a blanket when there are other people in the room. Children who are being abused do not tend to fight back because they think they are physically unable to. Children often do not tend to remember every incident of abuse or every detail because they are focused on staying safe while the abuse is occurring and they "psychologically distance" themselves while being abused. One of the main ways people tend to deal with abuse is to block it out of their memory and then later forget details.

After trial, the court instructed the jury not to consider Dr. Ward's testimony as evidence that the victims were abused, but only to decide on their credibility. "You have heard testimony from Dr. Jody Ward for the purpose of understanding and explaining the behavior of the alleged victims in this case and not as proof that the molestations occurred. [¶] Dr. Ward's testimony is not evidence that the defendant committed any of the crimes charged against him. [¶] . . . [¶] You may consider this evidence only in deciding whether or not [the daughters'] conduct was not inconsistent with the conduct of someone who has been molested and in evaluating the believability of their testimony."

E.  *Verdict and Sentence*

On May 17, 2018, the jury found appellant guilty of three counts of committing lewd and lascivious acts with children under 14 years of age (§ 288, subd. (a); counts 1-

3). The jury also found true that appellant committed the offenses against more than one victim. (§ 667.61, subd. (e)(4).)

On July 20, 2018, the trial court sentenced Delp to state prison for 30 years to life, comprised of consecutive terms of 15 years to life for the primary counts against each daughter, and a concurrent term of 15 years to life for the second count against the older daughter. The court also imposed a $1,000 restitution fine, $514.58 in booking fees, and $210 in court conviction and court operation assessments. We discuss the details of the fine, fees, and assessments in part IV.A. below.

Appellant filed a timely notice of appeal.

## II

## THE RELIABILITY OF CSAAS TESTIMONY

Delp argues the trial court erred by admitting Dr. Ward's testimony related to the Child Sexual Assault Accommodation Syndrome (CSAAS) because the syndrome "purports to draw generalized scientific conclusions from a set of observable data" and therefore "can only be admitted if the three-pronged analysis under the *Kelly-Frye* rule has been satisfied." The *Kelly-Frye* rule holds "evidence based on a new scientific method of proof is admissible only on a showing that the procedure has been generally accepted as reliable in the scientific community in which it developed." (*People v. McDonald* (1984) 37 Cal.3d 351, 372-373 (*McDonald*).)

Delp argues CSAAS fails that reliability test because the syndrome is not generally accepted in the relevant scientific community. He concludes Dr. Ward's

testimony should not have been admitted against him to support his accusers' credibility. Dr. Ward's testimony was particularly critical in the case against him, he argues, because his accusers didn't come forward for nearly 10 years, and there was no physical evidence to test their accusations. He points out that even law enforcement conceded there was no evidence against him other than the word of his victims. As a result, the case came down to the victims' credibility alone.

The law in California is clear, however, that the *Kelly-Frye* rule does not apply to the admission of medical expert testimony about syndromes like CSAAS which are not designed to predict or establish a person has in fact suffered from abuse. California law distinguishes between scientific evidence and expert medical opinion. Scientific evidence must meet the *Kelly-Frye* test for reliability, but expert medical opinion is not subject to the same test. (*McDonald*, *supra*, 37 Cal.3d at pp. 372-373, overruled on other grounds by *People v. Mendoza* (2000) 23 Cal.4th 896.)

The *Kelly-Frye* rule applies to cases involving novel devices or processes, not to general expert medical testimony, such as a psychologist's testimony about the behaviors observed in child victims of sexual abuse. As our Supreme Court explained in *McDonald*, "When a witness gives his personal opinion on the stand—even if he qualifies as an expert—the jurors may temper their acceptance of his testimony with a healthy skepticism born of their knowledge that all human beings are fallible. But the opposite may be true when the evidence is produced by a machine: like many laypersons, jurors tend to ascribe an inordinately high degree of certainty to proof derived from an

14

apparently 'scientific' mechanism, instrument, or procedure. Yet the aura of infallibility that often surrounds such evidence may well conceal the fact that it remains experimental and tentative. [Citation.] For this reason, courts have invoked the *Kelly-Frye* rule primarily in cases involving novel devices or processes such as lie detectors, 'truth serum,' Nalline testing, experimental systems of blood typing, 'voiceprints,' identification by human bite marks, microscopic analysis of gunshot residue, and hypnosis." (*McDonald*, *supra*, 37 Cal.3d at pp. 372-373.)

California courts don't apply the same rule to expert medical testimony. As the *McDonald* court explained, "We have never applied the *Kelly-Frye* rule to expert medical testimony, even when the witness is a psychiatrist and the subject matter is as esoteric as the reconstitution of a past state of mind or the prediction of future dangerousness, or even the diagnosis of an unusual form of mental illness not listed in the diagnostic manual of the American Psychiatric Association." (*McDonald*, *supra*, 37 Cal.3d at p. 373.) Similarly, the testimony of a psychologist who assesses whether a criminal defendant displays signs of deviance or abnormality is not subject to the *Kelly-Frye* rule. (*People v. Stoll* (1989) 49 Cal.3d 1136, 1155-1159.) In *Stoll*, the court observed, "No precise legal rules dictate the proper basis for an expert's journey into a patient's mind to make judgments about his behavior." (*Id.* at p. 1154.) The *Stoll* court also described a psychological evaluation as "a learned professional *art*, rather than the purported exact 'science' with which *Kelly*/*Frye* is concerned." (*Id.* at p. 1159.)

15

CSAAS testimony is a special case of this rule, and California courts routinely allow medical experts to testify about CSAAS and the insights it may impart to the jury about how child victims react to sexual assault. CSAAS expert testimony is admissible because it "'is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.'" (*People v. McAlpin*, *supra*, 53 Cal.3d at p. 1301, quoting Myers et al., *Expert Testimony in Child Sexual Abuse Litigation* (1989) 68 Neb. L. Rev. 1, 89, fn. omitted.) Such expert testimony is admissible to assist the jury in evaluating the witness's credibility but "not admissible to prove that the complaining witness has in fact been sexually abused." (*People v. Brown* (2004) 33 Cal.4th 892, 906.) Expert testimony regarding CSAAS is admissible for that limited purpose once there is independent evidence of abuse, as there was in this case, because otherwise the expert testimony would lack foundation. (See *id.* at p. 908.) We see no reason to depart from this approach in general or as it relates to CSAAS in particular.

Delp relies on *People v. Bledsoe* (1984) 36 Cal.3d 236 for reaching the contrary result. In that case, the Supreme Court held an expert may be precluded from testifying regarding rape-trauma syndrome in a criminal case. However, *Bledsoe* does not stand for the proposition that medical expert testimony must satisfy the *Kelly-Frye* rule to be admissible. Rather, *Bledsoe* says expert testimony about the rape-trauma syndrome is not relevant to establish that a rape occurred. As the Supreme Court explained in a later case, "*Bledsoe* involved a rape prosecution in which the victim and defendant gave conflicting

16

testimony on the issue of consent. In the prosecution's case-in-chief, the victim's rape counselor testified that, in her expert opinion, the victim had been suffering from 'rape trauma syndrome.' [Citation.] The counselor described the concept as an '"acute stress reaction to the threat of being killed"'; it often progressed in three phases encompassing such varied behavior as agitation, fear, masked feelings, acting as though nothing has happened, looking normal to others, and depression. [Citation.] Defendant objected at trial on 'relevance' grounds. [Citation.] On appeal, the parties debated whether the evidence satisfied the *Kelly*/*Frye* test, with *no one disputing* that such test was the appropriate standard." (*People v. Stoll*, *supra*, 49 Cal.3d at p. 1160.) Because "other evidence at trial had established that the victim promptly reported the attack, immediately displayed emotional upset, and bore bruises and other signs of injury . . . [w]e . . . inferred that the expert's testimony was *not* offered for the limited purpose of explaining any post-rape conduct (e.g., delayed reporting) which a lay jury might otherwise view as inconsistent with a forcible rape claim. Under our view of the facts, expert testimony describing the syndrome and applying it to this victim was used to prove that 'a rape *in the legal sense* had, in fact, occurred.'" (*Id.* at p. 1160.) The *Bledsoe* court concluded the counselor's testimony should not have been admitted to show a rape had occurred, but "did not hold that the *Kelly*/*Frye* test applied to the expert opinion in that case, nor did [the Court] discuss the test's relationship to 'syndrome' or other expert psychological evidence in general." (*Id.* at p. 1161.)

Delp urges us to adopt the approach announced recently by the New Jersey Supreme Court in *State v. J.L.G.* (2018) 234 N.J. 265. There, the court prohibited expert CSAAS testimony under the *Kelly-Frye* rule, except as the testimony relates to the fact that victims of child sexual abuse tend to delay disclosure and the victim can't adequately explain the delay. (*State*, at pp. 294-295, 302.) We are persuaded that the *Kelly-Frye* line of authority does not preclude admission of Dr. Ward's testimony regarding CSAAS. Expert opinion that witnesses show patterns of behavior consistent with observed responses in victims of child sexual assault is evidence which bears upon whether the witnesses were telling the truth and is admissible for that purpose. "The testimony and the matter upon which it is based also meet traditional standards for competent expert opinion, without need for additional screening procedures applicable to new, novel, or experimental 'scientific' evidence not previously accepted in court." (*People v. Stoll*, *supra*, 49 Cal.3d at p. 1161.) We therefore decline Delp's invitation to revisit this settled area of the law.

### III

### CRUEL AND UNUSUAL PUNISHMENT

Delp filed a supplemental brief arguing that the One Strike life sentence (§ 667.61, subd. (e)(4)) imposed for three instances of lewd touching against two child victims is cruel and unusual. He raised the argument based on a newly published opinion of the Second District, Division One. After the parties briefed the issue, however, the California

18

Supreme Court ordered that the opinion not be published. (Cal. Rules of Court, rule 8.1125(c)(2).)

Though "[a] Supreme Court order to depublish is not an expression of the court's opinion of the correctness of the result of the decision or of any law stated in the opinion" (Cal. Rules of Court, rule 8.1125(d)), the order does deprive the opinion of precedential value and prevents us from citing to it. (Cal. Rules of Court, rule 8.1115(a).) We will, nevertheless, discuss the legal principles the parties have raised in their supplemental briefs and the application of those principles to this case.

Article I, section 17 of the California Constitution prohibits infliction of cruel or unusual punishment. (*People v. Baker* (2018) 20 Cal.App.5th 711, 723 (*Baker*).) Faced with a challenge under this provision, our task is to determine "whether a particular penalty given '"is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity."'"[1] (*People v. Cole* (2004) 33 Cal.4th 1158, 1235.) Where there are no underlying disputed facts, it is a legal question whether a sentence constitutes cruel or unusual punishment.[2] (*People v. Mantanez* (2002) 98 Cal.App.4th 354, 358.)

---

[1] The inquiry is slightly different under the Eighth Amendment to the United States Constitution, which prohibits the infliction of "cruel *and* unusual" punishment rather than "cruel *or* unusual" punishment. (*Baker*, *supra*, 20 Cal.App.5th at p. 723.) However, Delp raises his challenge under the state constitutional provision alone, so we limit our analysis to that topic.

[2] Delp didn't raise this argument in the trial court. Although that ordinarily would forfeit the argument on appeal, we exercise our discretion to address the argument because it presents an important question of law that requires no further factual

*[footnote continued on next page]*

We employ a three-part analysis to determine whether a sentence is grossly disproportionate. (*People v. Johnson* (2010) 183 Cal.App.4th 253, 296.) "First, we review 'the nature of the offense and/or the offender, with particular regard to the degree of danger both present to society.'" (*Ibid*.) This analysis requires consideration of "'the circumstances of the offense, including the defendant's motive, the extent of the defendant's involvement in the crime, the manner in which the crime was committed, and the consequences of the defendant's acts,'" as well as "'the defendant's age, prior criminality[,] and mental capabilities.'" (*People v. Cole*, *supra*, 33 Cal.4th at p. 1235.) "Second, we compare the challenged punishment with punishments prescribed for more serious crimes in our jurisdiction. [Citation.] Third, and finally, we compare the challenged punishment to punishments for the same offense in other jurisdictions. [Citation.] The importance of each of these prongs depends upon the facts of each specific case[,] [and] . . . we may base our decision on the first prong alone." (*Johnson*, at pp. 296-297.)

As the *Baker* court discussed in more detail, our Supreme Court has found unconstitutional a life sentence for a second offense of indecent exposure (*In re Lynch* (1972) 8 Cal.3d 410, 413), a single incident of lewd and lascivious touching of a child's private parts in violation of section 288 (*In re Rodriguez* (1975) 14 Cal.3d 639, 654-656), and felony murder by a 17-year-old defendant (*People v. Dillon* (1983) 34 Cal.3d 441,

---

development in the trial court. (See *In re Sheena K.* (2007) 40 Cal.4th 875, 887-889; *People v. Williams* (1998) 17 Cal.4th 148, 161-162, fn. 6.)

482, 489). (*Baker*, *supra*, 20 Cal.App.5th at p. 724.) As in *Rodriguez*, Delp argues the statutory sentencing scheme is unconstitutional as applied to his case, not that the sentencing scheme is unconstitutional on its face in all applications. (*Rodriguez*, at p. 654; see also *Baker*, at p. 724.)

Delp argues the nature of the offenses does not warrant the two consecutive 15-year-to-life sentences the court imposed. He focuses on comparing his conduct to the other sexual offenses that may subject an offender to a sentence of 15 years to life under the One Strike law. Unlike his offense, nearly all of those offenses involve the use of force to commit a nonconsensual sexual act. (§ 667.61, subd. (c).) Those other predicate offenses are:

- Rape accomplished by force, fear, or threat of retaliation (§ 261, subds. (a)(2) & (6); 262, subds. (a)(1) & (4));
- Rape or sexual penetration accomplished by force and in concert with another person (§ 264.1);
- Committing a lewd or lascivious act on a child under the age of 14 years through use of force or fear (§ 288, subd. (b));
- Sexual penetration accomplished by force or fear (§ 289, subd. (a)); and
- Sodomy or oral copulation accomplished by force, fear, or threat of retaliation (§§ 286, subds. (c)(2), (c)(3), & (d)); 287, subds. (c)(2), (c)(3), & (d)).[3]

---

[3] Sodomy and oral copulation are predicate offenses when accomplished without force if committed by people acting in concert if the victim is incapable of consent because of a mental disorder or developmental or physical disability. (§§ 286, subd. (d); 287, subd. (d).)

There are two predicate offenses which don't require force or fear—continuous sexual abuse of a child in violation of section 288.5 and committing lewd and lascivious acts against a child under the age of 14 years in violation of section 288, subdivision (a). (§ 667.61, subd. (c).) As all these provisions make clear, the major—though not sole— focus of the provision is to impose greater punishment on sexual offenses accomplished through violence or the threat of violence.

However, it takes even more to trigger a sentence of 15 years to life. The offender must also be found to have committed one of the predicate offenses in a manner designated a special circumstance under section 667.61, subdivision (e).[4] Most of those enumerated special circumstances involve an increase in the risk of harm, mainly to the victim but also in some cases to standers-by. The heightened sentencing comes into play when a defendant commits the offense during a kidnapping or burglary, by using a deadly weapon, by binding the victim or another person, or by administering a controlled substance. Other special circumstances apply only to the predicate offenses of sodomy or oral copulation by force, fear, or threat, or rape or penetration by force committed in concert with another person. (§ 667.61, subd. (e)(7).) In addition, and as relevant here, application of a 15-year-to-life sentence may also be triggered by committing one of the predicate offenses against "more than one victim." (Pen. Code, § 667.61, subd. (e)(4).)

---

[4] The special circumstances identified in section 667.61, subdivision (d) require a sentence of 25 years to life and aren't relevant here.

Delp argues his conduct falls at the low end of the low end of conduct to which 15-year-to-life sentences apply. His predicate offense, lewd conduct against a child 14 years old or younger, did not involve violence or its threat. Nor was he convicted of committing the offense in a manner that increased the risk of harm to his victims or anyone else. Instead, he was convicted of committing a nonviolent act on three occasions against two children between the ages of 5 and 9 years old. He argues the predicate offense itself was minor, involving touching of the outside of the children's vaginas without penetration. He says these facts show an imbalance between the nature of the offenses and his punishment. He says what he did is categorically different than the main body of offenses punished by the One Strike law. He also argues his conduct was not especially egregious because he simply "touch[ed] two sisters in close physical and temporal proximity, [which] may only indicate an aberrant behavior that does not suggest a danger that there will be future victims if the law does not intervene."

Delp also argues more serious sexual offenses are not subject to life sentences.[5] He claims someone convicted of raping two children when they can't resist because they're asleep or intoxicated may be sentenced to no more than a 16-year determinate term. (§§ 261, subd. (a)(3) & (4); 264, subd. (a).) He says the punishment is the same for rape or sodomy when the children are incapable of resisting, but the offense doesn't involve overt force or threat. (§§ 262, subd. (a)(2) & (3); 286, subds. (f) & (g).) Meanwhile,

---

[5] Delp doesn't argue other states punish offenses like his less severely than California has punished him, so we don't address the law of other jurisdictions.

sexual penetration or sodomy with a child under 14 years and more than 10 years younger than the perpetrator is punishable by no more than eight years. (§§ 286, subd. (c)(1); 289, subd. (j).) Delp argues the One Strike law does not apply to any of these crimes, and a person convicted of them is not subject to a life sentence, even if they committed the offenses on multiple occasions and against multiple victims.

We disagree with Delp's choice of comparison crimes. In the first place, "[t]he penalties for single offenses . . . cannot properly be compared to those for multiple offenses." (*People v. Crooks* (1997) 55 Cal.App.4th 797, 807.) The fact that Delp committed these offenses against two different children over a period of weeks or months, makes his conduct more serious than he allows. (*People v. Christensen* (2014) 229 Cal.App.4th 781, 789, 808 [upholding sentence of 27 years to life imposed for conviction of lewd acts committed against three children].)

Second, the statute setting out punishment for rape offenses explicitly allows for prosecution under section 288.7. (§ 264, subd. (c)(3).) That provision, added to the Penal Code by the Sex Offender Punishment, Control, and Containment Act of 2006, mandates a sentence of 25 years to life for anyone who engages in a *single* act of sexual intercourse or sodomy—by force or otherwise—with a child 10 years or younger. (§ 288.7, subd. (a).) Subdivision (b) of the same provision mandates a sentence of 15 years to life for anyone who engages in a *single* act of oral copulation or penetration—by force or otherwise—with a child 10 years or younger. (§ 288.7, subd. (b); see also *Baker*, *supra*, 20 Cal.App.5th at p. 722.) While Delp's conduct doesn't fall under this statute, it's

24

notable that someone who did what he did but took the additional step of penetrating the children could have been sentenced to three consecutive terms totaling 45 years to life in prison. (See *People v. Vital* (2019) 40 Cal.App.5th 925, 929-930 [trial court imposed two consecutive and three concurrent 15-year-to-life sentences for conviction on five counts of violating section 288.7, subd. (b)].)

As a consequence, we don't agree with Delp that his punishment is out of step with the nature of his offense or the way California punishes more serious offenses. The Legislature decided sex offenses against very young children should be treated especially severely, and it was within their power and discretion to treat offenses against the most vulnerable children as being just as serious as sex offenses committed against adults and teenagers by means of force or threat of force. After all, children so young have almost no means of protecting themselves, and likely don't have the knowledge or psychological resources to realize what's happening to them. Though it's true "lewd conduct on a child may not be the most grave of all offenses, . . . its seriousness is considerable . . . [and] may have lifelong consequences to the well-being of the child." (*People v. Christensen*, *supra*, 229 Cal.App.4th at p. 806; see also *Ashcroft v. Free Speech Coalition* (2002) 535 U.S. 234, 244 ["sexual abuse of a child is a most serious crime and an act repugnant to the moral instincts of a decent people"].)

A defendant seeking to overturn a sentence as cruel or unusual faces a considerable burden. "The doctrine of separation of powers is firmly entrenched in the law of California, and a court should not lightly encroach on matters which are uniquely

25

in the domain of the Legislature. Perhaps foremost among these are the definition of crime and the determination of punishment." (*People v. Wingo* (1975) 14 Cal.3d 169, 174.) A court should declare the length of a sentence mandated by the Legislature is excessive only in the rarest of cases. (*Baker*, *supra*, 20 Cal.App.5th at p. 724.) This is not such a case.

## IV

## ABILITY TO PAY FEES, ASSESSMENTS, AND FINES

Delp argues the court erred by imposing booking fees, conviction and court operation assessments, and a restitution fine when he claims he doesn't have the ability to pay them. Each challenge presents slightly different legal and factual issues, so we address them separately.

A. *Background Facts*

The probation report recommended that the trial court impose several fees, assessments, and fines. The report recommended (i) a $514.58 booking fee under Government Code section 29550.2, subdivision (a), (ii) $90 in conviction assessments under Government Code section 70373, (iii) $120 in court operations assessments under Government Code section 1465.8, subdivision (a)(1), and (iv) a $10,000 restitution fine under Penal Code section 1202.4, subdivision (b), and (v) the costs of a presentence probation report in an amount to be determined by the probation office but no greater than $1,095 under Penal Code section 1203.1b.

In a sentencing memorandum filed in the trial court, Delp objected generally to the imposition of fines and fees on the ground that he wouldn't be able to pay them. "The People have requested a sentence of thirty years to life. . . . As defendant is seventy years old, any term of imprisonment will likely result in him living the rest of his years in prison. . . . [D]efendant would ask this Court to find an inability to pay fines and fees as noted in the sentencing recommendation as defendant has been in custody for almost two years and has no means of paying them."

Delp's objection was not specific as to which fees and fines he targeted. However, the statutes allowing several of these fees, assessments, and fines explicitly allow trial courts to consider a defendant's ability to pay. The booking fees statute calls on the court to impose such fees, "[i]f the person has the ability to pay." (Gov. Code, § 29550.2, subd. (a).) The statute providing for restitution allows a fine between $300 and $10,000 and allows the trial courts to consider ability to pay among other factors in deciding whether to impose a fine over the $300 minimum amount. (Pen. Code, § 1202.4, subd. (b)(1).) The statute allowing the court to charge convicted persons for the costs of probation reports goes further. It not only allows the trial court to consider a defendant's ability to pay, but affirmatively requires it to "make a determination of the ability of the defendant to pay all or a portion" of the costs before imposing them. (Pen. Code, § 1203.1b, subd. (a).)

At Delp's sentencing, the trial court acknowledged Delp's objection and his potential difficulty paying. The court noted defense counsel had "indicated in his

27

briefing—and this is consistent with [appellant] being . . . in custody for two years—apparently there's not a lot of money in the piggy bank right now for him." The court noted that under the statutes it could consider Delp's ability to pay in deciding whether to impose "the cost of a presentence probation report and some other fines and fees, . . . recognize[d] the inherent difficulty with regard to paying all fees . . . [and] fines," and said "to the extent that [I] can exercise [my] discretion, [I] will do so." The court then decided, "[i]n regard to the presentence probation report, the Court would exercise its discretion and—and impose no monetary obligation."

However, the court was under the impression that booking fees, conviction assessments, and court operations assessments, were mandatory under the statutes and imposed them without regard to Delp's ability to pay. The court commented "[t]here are a number of fines and fees that the Court must impose with no discretion allowed. [¶] Booking fees of $514.58 . . . would be imposed." The court also indicated that "by law" it had to impose conviction assessment fees of $90 ($30 per conviction) and court operations assessments of $120 ($40 per conviction).

As for the restitution fine, the trial court understood it had discretion whether to impose more than the minimum amount. The statute mandates that the court impose a restitution fine of at least $300 for a felony conviction, but allows up to $10,000, and permits the trial court to take into account Delp's ability to pay only in deciding how

28

much to impose above the $300 mandatory minimum.[6] (§ 1202.4, subd. (b)(1).) The probation report recommended the court impose the maximum $10,000 restitution fine. However the court noted "the ability to pay . . . [is] a factor for me to consider with regard to the victim restitution" and in the end decided to reduce the recommended restitution fine from $10,000 to $1,000.

B.  *Restitution Fine*

Delp argues *Dueñas*, which was decided in January 2019 after his sentencing, concluded defendants have a due process right under the federal and state constitutions to a hearing on their ability to pay various fines and fees, including restitution fines. (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1164.) Specifically, *Dueñas* held "to avoid serious constitutional questions" raised by the statutory restitution scheme, the court must stay execution of the mandatory minimum restitution fine under section 1202.4 unless it determines the defendant has the ability to pay. (*Id.* at p. 1172.) The People argue Delp has forfeited his challenge to the restitution fine by failing to raise his objection in the trial court.

We disagree that the trial court's decision to impose a restitution fine implicates *Dueñas*. We also disagree that Delp has forfeited his challenge. As we recounted above, Delp did object that he couldn't pay the fees and fines the probation report recommended,

---

[6] The statute allows trial courts to forego a restitution fine entirely for "compelling and extraordinary reasons," but that exception does not apply here since "[a] defendant's inability to pay shall not be considered a compelling and extraordinary reason not to impose a restitution fine. Inability to pay may be considered only in increasing the amount of the restitution fine in excess of the minimum fine pursuant to paragraph (1) of subdivision (b)." (§ 1202.4, subd. (c).)

which included, most significantly, the recommendation to impose a restitution fine in the amount of $10,000. The trial court acknowledged Delp's objection specifically as it related to the restitution fine. It then decided to reduce the recommended restitution fine from $10,000 to $1,000.

Section 1202.4 sets out how to calculate the amount of a restitution fine. Subdivision (b)(1) places the determination of the fine amount within the discretion of the trial court, within the $300 minimum and $10,000 maximum. (§ 1202.4, subd (b)(1).) Subdivision (b)(2) recommends that the court set the fine amount "as the product of the minimum fine pursuant to paragraph (1) multiplied by the number of years of imprisonment the defendant is ordered to serve, multiplied by the number of felony counts of which the defendant is convicted." (§ 1202.4, subd. (b)(2).) Subdivision (d) then directs the court to "consider any relevant factors, including, but not limited to, the defendant's inability to pay, the seriousness and gravity of the offense and the circumstances of its commission, any economic gain derived by the defendant as a result of the crime, the extent to which any other person suffered losses as a result of the crime, and the number of victims involved in the crime." The provision specifies the victims' losses may include "intangible losses, such as psychological harm caused by the crime" and also that "[c]onsideration of a defendant's inability to pay may include his or her future earning capacity." (§ 1202.4, subd. (d).)

Nearly every one of these factors favors imposing a high restitution fine. According to the probation report, under the statutory formula, Delp would have faced a

fine of $24,300 due to its seriousness as reflected in the length of the sentence. The probation report recommended $10,000 only because that's the statutory maximum. He committed the offense against multiple victims who suffered psychological damage, and, as the probation report notes, Delp displayed sophistication and abused a position of trust in committing the offenses. The only statutory factors that favored reducing Delp's fine below $10,000 were the fact that he didn't derive an economic gain from his crimes and that his health condition limited his future earning capacity. (§ 1202.4, subd. (d).)

The court was not required to hold a separate hearing or make express findings as to the factors bearing on the amount of restitution it imposed. (§ 1202.4, subd. (d).) However, we know Delp did raise the issue and the court did hold a hearing at which it considered Delp's financial condition and decided to impose $1,000 instead of $10,000. Delp had the burden of demonstrating his inability to pay the recommended restitution fine at that hearing. (*Ibid.*; *People v. Romero* (1996) 43 Cal.App.4th 440, 449 ["The statute thus impliedly presumes a defendant has the ability to pay and expressly places the burden on a defendant to prove lack of ability"].) His basis for reducing the fine and assessments was that he wouldn't be able to pay due to his age and the length of his sentence.

It's also important that the trial court was required to hold a hearing on and make a finding regarding Delp's ability to pay all *or a portion* of the costs of the presentence probation report. (§ 1203.1b, subd. (a), italics added.) That statute specifies "in making a determination of whether a defendant has the ability to pay, the court *shall* take into

31

account the *amount of any fine imposed upon the defendant and any amount the defendant has been ordered to pay in restitution.*" (§ 1203.1b, subd. (b)(3), italics added.) After the hearing, at which the trial court considered both restitution and the probation report costs, as well as other assessments, the court reduced the recommended restitution amount from $10,000 to $1,000 and refused to impose *any* costs for the probation report. We conclude the trial court found Delp *could* afford to pay a $1,000 restitution fine but *could not* afford to pay any portion of the probation report costs in addition to that amount. It follows that the trial court's process did not violate the principles enunciated in *Dueñas*.

To the extent Delp questions the rationality of the court's determination, the probation report provided a more than adequate basis for imposing the $1,000 restitution fine. Delp had worked for years as finance manager at an automobile dealership. His annual salary when he was arrested in December 2016 was $175,000 to $180,000, and he also received $2,833.33 each month in Social Security benefits.[7] He reported a total monthly income of $17,416.66, total monthly expenses of $3,870, and a monthly net income of $13,546.66. Moreover, he had no family relying on him for support. Delp is divorced and the father of two adult children, both in their 40s. The divorce occurred in 2004, and he owes no support to his former spouse or his children. His own parents are deceased. Relevant to his ability to work while in prison, Delp said he was in good mental health but poor physical health. He reported chronic pain from ruptured discs in

---

[7] Social Security monthly benefits paid to a beneficiary are suspended when they are imprisoned for a criminal offense. (42 U.S.C. § 402, subd. (x).)

his spine and said he suffered a heart attack in February 2017, which required surgery for a heart stent to correct arterial blockage. Though these last circumstances may limit his ability to earn wages while in prison, his financial resources before his conviction provide a reasonable basis for imposing the reduced fine.

We therefore affirm the order imposing $1,000 as a restitution fine.

C. *Booking Fees*

Government Code section 29550.2, subdivision (a) requires the court to impose booking fees on a convicted defendant, *provided* the defendant has the ability to pay. The code says, "Any person booked into a county jail pursuant to any arrest . . . is subject to a criminal justice administration fee for administration costs incurred in conjunction with the arresting and booking if the person is convicted of any criminal offense relating to the arrest and booking." However, it also says, "*If the person has the ability to pay*, a judgment of conviction shall contain an order for payment of the amount of the criminal justice administration fee by the convicted person." (Gov. Code, § 29550.2, subd. (a), italics added.) This provision makes clear imposing the booking fee was not mandatory if Delp was unable to pay.

The trial court did not recognize its own discretion, but instead imposed the booking fees as if they were mandatory and without considering Delp's ability to pay them. The court commented "[t]here are a number of fines and fees that the Court must impose with no discretion allowed. [¶] Booking fees of $514.58 . . . would be imposed."

The People concede the error but argue Delp forfeited his challenge by failing to object when the trial court imposed the fees as mandatory. They argue, "appellant argued that he did not have the ability to pay the fines and fees recommended by probation because appellant had been in custody for two years awaiting trial. [Citation.] However, appellant never objected when the court stated it had no discretion but to impose the booking fee. [Citation.] Therefore, appellant has forfeited his claim that the trial court was mistaken about its discretion to impose the booking fee."

Respectfully, this parses things too finely. The statute's plain language mandates booking fees if a defendant has the ability to pay. The probation report recommended that the court impose $514.58 in booking fees. Delp objected to the recommendation on the basis that he can't afford to pay them. And the trial court denied relief under the mistaken belief that it was required to impose the fees, irrespective of his ability to pay. Delp did enough to bring this issue to the trial court's attention and preserve the issue for appeal.

Delp asks us to strike the booking fee on the basis that the trial court found as a factual matter that Delp *did not* have the ability to pay. He locates this finding in the court's comment, in view of his life sentence, that "I recognize the inherent difficulty with regard to paying all fees. To the extent that—and fines—to the extent that the Court can exercise its discretion, it will do so in that regard." We don't think it's so clear the court made a finding on this issue. While it's true the trial court found Delp could pay a $1,000 restitution fine but no portion of the costs of the probation report, the court made that determination at the same time it ordered Delp to pay the $514.58 in booking fees

34

and the $210 in assessments. It was within the court's discretion to consider those other obligations when it determined Delp could afford no more.

Thus, we agree with the People that "it is not clear from the trial court's actions that it would have struck the booking fee if it was aware of its discretion with respect to that fee." We also agree that the best remedy is to reverse the booking fee and "remand[] to the trial court so that it can knowingly exercise its discretion to either impose or strike the booking fee."

We note that the Legislature has repealed Government Code section 29550.2 effective July 1, 2021 and directed that "the unpaid balance of any court-imposed costs pursuant to Section . . . 29550.2 . . . is unenforceable and uncollectible and any portion of a judgment imposing those costs shall be vacated." (Assem. Bill No. 1869 (2019-2020 Reg. Sess.) § 6111.) We express no opinion on how that legislative change should affect the trial court's decision on remand.

D. *Conviction Assessment and Court Operations Assessment*

That leaves us with the question whether the trial court violated Delp's due process and equal protection rights by imposing $210 in conviction and court operation assessments without first determining whether he has the ability to pay them.

The statutes mandating these assessments apply to all persons convicted of an offense and don't require the courts to consider the convicted person's ability to pay. (Gov. Code, §§ 70373 & 1465.8.) Government Code section 70373 says, "To ensure and maintain adequate funding for court facilities, an assessment shall be imposed on every

35

conviction for a criminal offense . . . in the amount of thirty dollars ($30) for each misdemeanor or felony." Government Code section 1465.8 says "To assist in funding court operations, an assessment of forty dollars ($40) shall be imposed on every conviction for a criminal offense." So, the assessments are mandatory and neither provision makes an exception based on a defendant's indigence. Delp argues *Dueñas* establishes he had a due process right under the federal and state constitutions to a hearing on his ability to pay the assessments. (See *Dueñas*, *supra*, 30 Cal.App.5th at p. 1164.)

The *Dueñas* court explained that such assessments, which were designed as nonpunitive fundraising measures, become punitive for people convicted of criminal offenses who are unable to pay for the simple reason that they impose hardships not experienced by convicts of means. For indigent convicts, imposing these assessments creates unpayable indebtedness, threatens access to credit, interferes with the responsibility to make childcare support payments, damages employment prospects, and in general impairs the ability to participate in civil society after serving their sentences. (*Dueñas*, *supra*, 30 Cal.App.5th at pp. 1164-1168.) The *Dueñas* court held that imposing assessments that are the same in amount for all defendants, but which have punitive consequences for the indigent alone violates due process and equal protection. (*Id*. at p. 1168.) The court therefore concluded a trial court must find a criminal convict has the present ability to pay before ordering them to pay such assessments. (*Ibid.*) Because the trial court already had found Dueñas indigent, the Court of Appeal reversed the

assessments outright. (*Id*. at pp. 1168-1169, 1172-1173.) The *Dueñas* court also held that an order imposing the minimum restitution fine must be stayed until the court determines a defendant has the ability to pay.

Some courts have criticized the *Dueñas* analysis. Some have held due process and equal protection never require an ability to pay finding before imposing generally applicable assessments or restitution fines. (*People v. Hicks* (2019) 40 Cal.App.5th 320, 329, review granted Nov. 26, 2019, S258946; *People v. Caceres* (2019) 39 Cal.App.5th 917, 928; *People v. Petri* (2020) 45 Cal.App.5th 82, 91-92; *People v. Kingston* (2019) 41 Cal.App.5th 272, 279.) Some courts have held assessments imposed on criminal defendants based on their convictions are, like restitution fines, punitive, and that both must be evaluated under the excessive fines clause, not the due process clause or the equal protection clause. (*People v. Cowan* (2020) 47 Cal.App.5th 32, 49, review granted June 17, 2020, S261952 [evaluating both assessments and restitution fines under excessive fines clause]; *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1069, review denied Dec. 11, 2019.) Other courts have agreed due process and equal protection require an ability to pay finding before imposing assessments and fees but have disagreed on restitution fines. (*People v. Son* (2020) 49 Cal.App.5th 565, 592-595, review denied Aug. 19, 2020; *People v. Kopp* (2019) 38 Cal.App.5th 47, 94-96, review granted Nov. 13, 2019, S257844.)

Though the California Supreme Court declined to review *Dueñas*, they have granted review in some of these later cases. (*People v. Hicks*, *supra*, 40 Cal.App.5th 320;

37

*People v. Kopp*, *supra*, 38 Cal.App.5th 47; *People v. Cowan*, *supra*, 47 Cal.App.5th 32.) The Court will decide whether courts must "consider a defendant's ability to pay before imposing or executing fines, fees, and assessments," and if so, "which party bears the burden of proof regarding defendant's inability to pay." (*Kopp*, review granted, Nov. 13, 2019, S257844.)

In this case, the People don't attack *Dueñas's* analysis, argue that *Dueñas* was wrongly decided, or argue that an Eighth Amendment analysis should apply as opposed to due process and equal protection. On the contrary, they concede the assessments are nonpunitive and imposing them on convicted persons who can't pay implicates due process. They therefore "do[] not seek to uphold the imposition of these assessments on those who have no ability to pay." In cases like this, where "no party has argued *Dueñas* was wrongly decided or briefed whether an Eighth Amendment analysis should displace the due process analysis" we have determined the better approach is "not [to] address those issues and instead simply apply *Dueñas's* holding." (*People v. Taylor* (2019) 43 Cal.App.5th 390, 398-399, 403 (*Taylor*) [applying *Dueñas* and remanding for an ability to pay hearing]; *People v. Jones* (2019) 36 Cal.App.5th 1028 (*Jones*) [applying *Dueñas* but finding no prejudice].)

The People do, however, argue Delp forfeited his objection by failing to raise it in the trial court and that the error was harmless beyond a reasonable doubt. We address those arguments below.

### 1. *Forfeiture*

Delp argues he did raise his due process and equal protection arguments by raising his ability to pay in general and asking the trial court to exercise whatever discretion it had to refuse to impose fines, fees, and assessments. We think that characterization reads his objection too broadly.

As we've noted, Delp objected generally to the imposition of fines and fees on the ground he wouldn't be able to pay them, but he did so without identifying the legal theory supporting his challenge. We think the most natural way to interpret his general objection—which did not mention due process, equal protection, or any other principle sounding in constitutional law—is as asking the court to consider his ability to pay where the relevant statute allowed it. As we have seen, the court was permitted to consider Delp's ability to pay in determining whether to impose more than $300 in restitution fines and whether to impose probation report costs and a booking fee but was not permitted to do so in determining whether to impose the assessments. Since the *Dueñas* ground for requiring an ability to pay hearing before imposing conviction and court operations assessments is new, we don't think Delp's general objection was enough to bring the issue to the attention of the trial court. (See *Jones*, *supra*, 36 Cal.App.5th at pp. 1032-1033 [observing the statutes were "silent as to the consideration of a defendant's ability to pay" and no court had yet held defendants have a due process right to an ability to pay hearing].)

The same consideration cuts against holding Delp has forfeited his due process objection. As this court held in *Jones* and again in *Taylor*, any such objection would have been futile before *Dueñas*, and the holding was not foreseeable. (*Jones*, *supra*, 36 Cal.App.5th at p. 1030; see also *id.* at p. 1033 ["a due process objection would have been 'futile or wholly unsupported by substantive law then in existence'"]; *Taylor*, *supra*, 43 Cal.App.5th at p. 399.) We concluded in both *Jones* and *Taylor* that a defendant sentenced before *Dueñas* does not forfeit the due process objection by failing to anticipate it. Our conclusion in those cases applies with equal force to the court operations and criminal conviction assessments at issue here. We therefore conclude Delp did not forfeit his objections to those assessments.

2. *Harmless error*

The People also argue we should affirm the trial court on the ground that the error in imposing these assessments was harmless, a route we took in *Jones*, *supra*, 36 Cal.App.5th at p. 1028.

In *Jones*, we concluded the error was harmless because the record demonstrated, beyond a reasonable doubt, that the defendant who was sentenced to state prison for a term of six years would earn sufficient prison wages to pay his fines and assessments of $370. (*Jones*, *supra*, 36 Cal.App.5th at p. 1035; see also, e.g., *People v. Castellano* (2019) 33 Cal.App.5th 485, 490-491 [courts should consider prison wages in determining an offender's ability to pay assessments, fees, and fines].) We concluded since able-bodied prisoners must work while imprisoned (§ 2700) for monthly wages of $12 to $56

(Cal. Code Regs., tit. 15, § 3041.2, subd. (a)(1)), "Jones will have sufficient time to earn these amounts during his sentence, even assuming Jones earns nothing more than the minimum. (At $12 a month, Jones will have earned $720 after five years, $300 of which will be deducted to pay for the restitution fine, leaving $420 to pay the remaining $70.)" (*Jones*, at p. 1035.)

Delp's circumstances are very different. When convicted, he was 70 years old and he's now 72. According to his filings in the trial court, he suffers chronic back pain due to ruptured discs in his spine. He also suffered a heart attack in February 2017, while incarcerated, which required surgery for a heart stent to correct arterial blockage. These health conditions raise a substantial doubt whether Delp is an able-bodied person capable of working while he's incarcerated. In addition, as we noted in *Taylor*, "[a] prisoner's assignment to a paid position 'is a privilege' that depends on 'available funding, job performance, seniority and conduct.'" (*Taylor*, *supra*, 43 Cal.App.5th at p. 402, citing Cal. Code Regs., tit. 15, § 3040, subd. (k).) Thus, we're not justified in inferring from the fact of his incarceration that Delp will be able to obtain a low paying job in prison. (*Taylor*, at p. 402 ["Taylor was 70 years old at the time of sentencing, however, and we know nothing about his health and whether he is capable of earning wages until he is 83 years old"].) We do know Delp previously earned a comfortable living, but both his salary and Social Security benefits terminated upon his arrest in December 2016. What we don't know is whether he has any remaining savings or assets to sell. (*Id.* at p. 401.) We also know that 50 percent of any wages Delp may be able to earn "will be deducted

41

to pay [the] outstanding restitution fine, plus another 5 percent for the administrative costs of this deduction." (*Id.* at p. 402, citing § 2085.5, subds. (a), (e) & Cal. Code Regs., tit. 15, § 3097, subd. (f).)

This means, the record in this case is closer to the record in *Taylor*, where we concluded the error was not harmless because the record was too poorly developed to determine, beyond a reasonable doubt, that the defendant could not establish their inability to pay. (*Taylor*, *supra*, 43 Cal.App.5th at pp. 401-402.) The record before us in this case similarly doesn't contain the information necessary to make that determination beyond a reasonable doubt. (*Jones*, *supra*, 36 Cal.App.5th at p. 1035; *Taylor*, at p. 403 ["it is the People's burden to show that the *Dueñas* error was harmless beyond a reasonable doubt"].) As we did in *Taylor*, we conclude the People have not carried their burden here.

Since the error was not harmless on this record, we must remand for the trial court to hold a hearing on Delp's ability to pay the assessments imposed on him. When it holds the ability-to-pay hearing on these assessments and the booking fees, the court must take into consideration the fact that Delp is responsible for paying $1,000 in restitution, must also take into account whether it will impose the $514.58 booking fees, and, to the extent the court considers Delp's prospective prison pay earnings, must account for the fact that such earnings will be garnished to pay the restitution fines.

# V

## DISPOSITION

We reverse the order that Delp pay $514.58 in booking fees and $210 in criminal conviction and court operations assessments, but affirm his conviction, sentence, and the imposition of restitution fines. We remand to the trial court so it may consider, in a manner consistent with this opinion and any changes in the applicable law, whether Delp has the ability to pay the booking fees, criminal conviction assessments, and court operations assessments.

NOT TO BE PUBLISHED IN OFFICAL REPORTS

SLOUGH
J.

We concur:

RAMIREZ
P. J.

RAPHAEL
J.

43